UNITED STATES OF AMERICA
UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

———

| | | |
|---|---|---|
| BRIAN GLOVER, Conservator for the Estate of MORGAN GLOVER, a minor, | ) ) ) | |
| Plaintiff, | ) ) | Case No. 1:08-cv-1086 |
| v. | ) ) | Honorable Joseph G. Scoville |
| NATIONWIDE MUTUAL FIRE INSURANCE COMPANY, et al., | ) ) ) | **OPINION** |
| Defendants. | ) ) ) | |

For over twenty-five years, insured parties have been caught in the crossfire between ERISA health plans and Michigan no-fault carriers, each of which contends that the other is primarily responsible for medical bills arising from an automobile accident. This case presents a variation on that familiar theme. It proves once again the truth of the adage that the only thing worse than having no insurance policy is having two.

This is a declaratory judgment action brought by Brian Glover on behalf of his daughter Morgan Glover, a minor. Morgan was seriously injured in a motor vehicle accident occurring in Muskegon County on November 22, 2007. At the time of the accident, her father was a participant in the CBI Holdings, Inc. Health and Welfare Plan, a medical benefits plan maintained by Mr. Glover's employer. Morgan qualifies for benefits under the Plan as a dependent. At the same time, the Glover family was covered for personal protection insurance (PIP) benefits under a policy of no-fault auto insurance written by defendant Nationwide Mutual Fire Insurance Company. The

Plan has paid over $59,000.00 for Morgan's hospital and other medical expenses. It has asserted a contractual right of reimbursement against Brian Glover to recover these expenses from a proposed settlement for Morgan's claims for pain and suffering and other non-economic loss, offered by the insurance company covering the driver who caused the accident.

Plaintiff's declaratory judgment action seeks a declaration that plaintiff is not responsible to reimburse the Plan from the proceeds of the tort settlement. Alternatively, plaintiff seeks a declaration that the no-fault carrier, Nationwide, is responsible for Morgan's medical bills under the PIP coverage of the no-fault policy, to the extent that plaintiff is required to reimburse the Plan for Morgan's medical expenses. The Plan has filed a counterclaim for recovery of medical expenses from plaintiff.

All parties have now moved for summary judgment. Chief Judge Paul Maloney has issued an order of reference (docket # 21) on the basis of the consent of the parties to the dispositive jurisdiction of a magistrate judge pursuant to 28 U.S.C. § 636(c)(1). The court has reviewed the submissions of the parties and concludes that no factual matters are in dispute and that the legal issues are governed by clearly settled law. Oral argument would therefore not be helpful. *See* W.D. MICH. LCIVR 7.2(d). For the reasons set forth below, the Plan will be granted summary judgment on its counterclaim for reimbursement, and an equitable lien will be imposed on the proceeds of the tort settlement. Plaintiff will be granted a summary judgment against Nationwide, the no-fault insurer, declaring Nationwide to be responsible for covering plaintiff's medical expenses under the PIP coverage of the no-fault policy, to the extent that plaintiff is required to reimburse the Plan for those medical expenses. Nationwide's motion for summary judgment against plaintiff will be denied.

## Findings of Fact

The underlying facts material to a resolution of this case are not subject to genuine dispute. The court finds the relevant facts to be as follows:

### A. Parties

1. Plaintiff Brian Glover is an individual residing in Muskegon, Michigan. His daughter Morgan, a minor, was seriously injured in a motor vehicle accident in Muskegon County on November 22, 2007.

2. Defendant CBI Holdings, Inc. Health and Welfare Plan (the Plan) is a self-funded employee welfare benefit plan sponsored by CBI Holdings, Inc. for the benefit of its employees and their dependents. At all relevant times, plaintiff Brian Glover was covered as a participant of the Plan by reason of his employment, and his daughter Morgan was covered as an eligible dependent.

3. Defendant Nationwide Mutual Fire Insurance Company is an insurance company licensed by the State of Michigan to issue policies of insurance in this state. At the time of the accident, Nationwide had in force policy no. 912H636199 (Policy, docket # 28) providing no-fault automobile coverage to Brian and Mary Glover.

### B. Relevant Provisions of the Plan and the Insurance Policy

4. The provisions of the Plan are set forth in an extensive summary plan description (SPD) found in the record as docket #'s 23 and 24. The provisions of the SPD differ for beneficiaries who have elected one of the preferred provider options (PPO) and those who have

elected the consumer-driven health plan (CDHP).  At all relevant times, Morgan Glover was enrolled in the PPO portion of the Plan.  (Aff. of Mabel Suzanne Fairley, ¶ 4).[1]

5.      The SPD includes detailed coordination-of-benefits provisions applicable to PPO coverage.  (pp. 27-30).  The coordination-of-benefits provisions purport to address coverage by a no-fault auto policy, as well as other health insurance or health plans.  The coordination-of-benefits provisions applicable to PPO coverage, however, do not disavow primary responsibility or otherwise indicate that the Plan's coverage will be secondary to no-fault coverage in the circumstances of this case.

6.      The provisions of the SPD relative to PPO coverage create rights of subrogation and reimbursement in favor of the Plan.  Relative to the present case, the SPD provides as follows:

**Right to Reimbursement**

The right to reimbursement means that if a third party causes a Sickness or Injury for which you receive a settlement, judgment, or other recovery, you must use those proceeds to fully return to the Plan 100% of any benefits you received for that Sickness or Injury.

(SPD, p. 31).  The SPD contains these further provisions concerning the right to reimbursement:

•      The Plan has first priority to receive payment on any claim against a third

party before the participant receives payment.

_____

[1] Plaintiff asserts that the Plan has not established whether the PPO or CDHP provisions apply to this case.  The Plan, however, has filed the affidavit of the claims administrator averring that the PPO provisions were elected for Morgan Glover.  The Plan has also submitted a sworn interrogatory answer to this same effect.  Plaintiff has provided no affidavit or other evidence to the contrary.

- The Plan's reimbursement rights apply to both full and partial settlements, no matter how the proceeds are characterized. The right to reimbursement attaches to economic, non-economic and punitive damages.

- The Plan may enforce its right to reimbursement regardless of whether the injured party has been made whole (fully compensated for injuries and damages).

- If a Plan participant receives payment of a settlement or judgment from any third party as a result of a sickness or injury, and the Plan asserts a right to those funds, the participant agrees "to hold those settlement funds in trust, either in a separate bank account or in your name or in your attorney's trust account."

(SPD, p. 32).

### C. Relevant Provisions of No-Fault Policy

7. The Nationwide no-fault policy contains the personal injury protection (PIP) coverage required by Michigan law (Policy, p. N2). The declarations page indicates that medical benefits are "coordinated." The policy's coordination-of-benefits provision, set forth below, therefore applies:

> If the Declarations show "COORDINATED MEDICAL BENEFITS," sums paid or payable to or for you or any relative shall be reduced by any amount paid or payable under any valid and collectible: individual, blanket or group disability or hospitalization insurance; medical, surgical or hospital direct pay or reimbursement health care plan; or car or premises insurance affording medical expense benefits. Such other insurance, plan or benefits are agreed to be primary protection for you or a relative. We will pay, except to the extent that: (a) benefits are paid or payable

under the primary protection; or (b) a provider within the primary protection is qualified and competent to render the products, services or accommodations.

(Policy, p. N4).

### E.    Events Giving Rise to Controversy

8.    Morgan Glover was a passenger in a car involved in an automobile accident on US 31 on November 22, 2007.  Morgan Glover suffered serious injuries as a result of the accident, requiring hospitalization, multiple surgeries, and rehabilitation.  The other vehicle, a 1996 GMC Jimmy, was operated by Virginia Hines.  At the time of the motor vehicle accident, Ms. Hines had liability insurance coverage through State Farm Insurance Company with policy limits of $50,000.  (Aff. of Virginia Hines, attached as Ex. 2 to Cross-Motion for Summary Judgment by Nationwide, docket # 48).

9.    The defendant Plan paid a total of $59,818.94, representing claims submitted on behalf of Morgan Glover for medical and related expenses (dates of service from November 22 through December 20, 2007) arising from her injuries in the automobile accident.  (Fairley Aff., ¶¶ 7-8).

10.    State Farm Insurance Company, on behalf of its insured Virginia Hines, has tendered policy limits of $50,000 to plaintiff as conservator for the Estate of Morgan Glover, a minor, in satisfaction of all claims arising from the automobile accident occurring on November 22, 2007.  (Letter of 3/28/08, attached as Ex. 2 to the Plan's Motion, docket # 33).

11.    The Plan has asserted a claim against the entire proceeds of the proposed settlement tendered by State Farm, under the reimbursement provisions of the SPD cited above. Plaintiff has denied the Plan's claim and instead has initiated this declaratory judgment action.

## Applicable Standard

Summary judgment is appropriate when the record reveals that there are no genuine issues as to any material fact in dispute and the moving party is entitled to judgment as a matter of law. FED. R. CIV. P. 56(c); *Synbrandt v. Home Depot U.S.A., Inc.*, 560 F.3d 553, 557 (6th Cir. 2009). The standard for determining whether summary judgment is appropriate is "whether 'the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.'" *Moses v. Providence Hosp. Med. Centers, Inc.*, 561 F.3d 573, 578 (6th Cir. 2009) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986)); *see Cady v. Arenac County*, 574 F.3d 334, 339 (6th Cir. 2009). The court must consider all pleadings, depositions, affidavits, and admissions on file, and draw all justifiable inferences in favor of the party opposing the motion. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Smith v. Williams-Ash*, 520 F.3d 596, 599 (6th Cir. 2008).

When the party without the burden of proof seeks summary judgment, that party bears the initial burden of pointing out to the district court an absence of evidence to support the nonmoving party's case, but need not support its motion with affidavits or other materials "negating" the opponent's claim. *See Morris v. Oldham County Fiscal Court*, 201 F.3d 784, 787 (6th Cir. 2000); *see also Minadeo v. ICI Paints*, 398 F.3d 751, 761 (6th Cir. 2005). Once the movant shows that "there is an absence of evidence to support the nonmoving party's case," the nonmoving party has the burden of coming forward with evidence raising a triable issue of fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). To sustain this burden, the nonmoving party may not rest on the mere allegations of his pleadings. FED. R. CIV. P. 56(e); *see Everson v. Leis*, 556 F.3d 484, 496 (6th Cir. 2009). The motion for summary judgment forces the nonmoving party to present evidence

sufficient to create a genuine issue of fact for trial. *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1478 (6th Cir. 1990). "A mere scintilla of evidence is insufficient; 'there must be evidence on which a jury could reasonably find for the [non-movant].'" *Dominguez v. Correctional Med. Servs.*, 555 F.3d 543, 549 (6th Cir. 2009) (quoting *Anderson*, 477 U.S. at 252); *see Reed v. International Union, United Aerospace & Agric. Implement Workers of Am.*, 569 F.3d 576, 579 (6th Cir. 2009).

Where, however, a moving party with the burden of proof seeks summary judgment, he faces a "substantially higher hurdle." *Arnett v. Myers*, 281 F.3d 552, 561 (6th Cir. 2002); *Cockrel v. Shelby County Sch. Dist.*, 270 F.3d 1036, 1056 (6th Cir. 2001). As shown above, the moving party without the burden of proof needs only show that the opponent cannot sustain his burden at trial. "But where the moving party has the burden -- the plaintiff on a claim for relief or the defendant on an affirmative defense -- his showing must be sufficient for the court to hold that no reasonable trier of fact could find other than for the moving party." *Calderone v. United States*, 799 F.2d 254, 259 (6th Cir. 1986) (quoting W. SCHWARZER, *Summary Judgment Under the Federal Rules: Defining Genuine Issues of Material Fact*, 99 F.R.D. 465, 487-88 (1984)). The United States Court of Appeals for the Sixth Circuit has repeatedly emphasized that the party with the burden of proof faces "a substantially higher hurdle" and "'must show that the record contains evidence satisfying the burden of persuasion and that the evidence is so powerful that no reasonable jury would be free to disbelieve it.'" *Arnett*, 281 F.3d at 561 (quoting 11 JAMES WILLIAM MOORE, ET AL., MOORE'S FEDERAL PRACTICE § 56.13[1], at 56-138 (3d ed. 2000))*; Cockrel*, 270 F.2d at 1056 (same). Accordingly, a summary judgment in favor of the party with the burden of persuasion "is inappropriate when the evidence is susceptible of different interpretations or inferences by the trier of fact." *Hunt v. Cromartie*, 526 U.S. 541, 553 (1999).

**Discussion**

**A.      Plan's Counterclaim for Reimbursement**

In its counterclaim, the Plan seeks reimbursement for benefits paid on behalf of Morgan to cover her hospital and other medical expenses arising from the motor vehicle accident on November 22, 2007.  It is undisputed that the insurer for the driver causing the accident has tendered its policy limits of $50,000 in satisfaction of all claims for non-economic loss suffered by Morgan as a result of the accident.[2]  Because the Plan expended over $59,000 for Morgan's medical care, its claim for reimbursement would capture the entire $50,000 settlement offered to cover Morgan's non-economic losses.  Plaintiff's complaint seeks a declaration that plaintiff is not liable to reimburse the Plan out of the proceeds of this settlement.  By its counterclaim, the Plan seeks to enforce its alleged right of reimbursement.

It is undisputed that the defendant Plan, as an employer-sponsored welfare benefit plan, is governed by the provisions of the Employee Retirement Income Security Act of 1974 (ERISA), 29 U.S.C. §§ 1001-1461.  Because ERISA preempts all state laws that "relate to" an employee benefit plan, ERISA § 514(a), 29 U.S.C. § 1144(a), the interpretation of the language of ERISA plans is governed by federal common law rules of contract interpretation.  *See University Hospitals v. S. Lorain Merchs. Ass'n Health & Welfare Benefit Plan & Trust*, 441 F.3d 430, 437 (6th Cir. 2006).  In construing ERISA plans, the court must consider both the policy language and the intent underlying the provision.  *See Citizens Ins. Co. of Am. v. Mid-Michigan Health ConnectCare*

---

[2] Under Michigan's no-fault scheme, a tortfeasor is not generally responsible for an injured party's economic damages arising from medical expense or work loss.  Tort recovery is limited to certain non-economic losses, such as serious impairment of body function or permanent serious disfigurement.  *See* MICH. COMP. LAWS § 500.3135.

*Network Plan*, 449 F.3d 688, 692 (6th Cir. 2006).  The court's paramount responsibility in

construing plan language is to "ascertain and effectuate the underlying intent."  *Id.* at 693.  The

defendant Plan brings its counterclaim to enforce the reimbursement provision of the SPD pursuant

to section 502(a)(3) of ERISA, which empowers plan fiduciaries to maintain a civil action for

equitable remedies to enforce the terms of a plan.

Plaintiff opposes the Plan's motion for summary judgment on a number of grounds,

which may be summarized as follows:  (1)  Section 502(a)(3)(B)(ii) of ERISA does not authorize

the Plan to bring this civil action; (2) the Plan has not established a factual basis for its claim of

reimbursement; (3) the SPD reimbursement language is ambiguous and is insufficient to overcome

the "make whole" doctrine; (4) the Plan acted as a volunteer, paying benefits that were clearly the

responsibility of Midwest.  The court finds that plaintiff's objections are not substantial and that the

Plan is entitled to summary judgment in its favor.

**1.**

Section 502(a)(3) of ERISA empowers a plan fiduciary to bring a civil action to

obtain "appropriate equitable relief . . . to enforce any provisions of this subchapter or the terms of

the plan."  29 U.S.C. § 1132(a)(3)(B)(ii).  In the present case, the Plan relies upon this section of

ERISA as the statutory authorization for its claim to enforce the reimbursement provisions of the

SPD and to impose an equitable lien on the proceeds of the settlement between plaintiff and the

insurer for Virginia Hines.  Plaintiff disputes the applicability of this section to the Plan's

counterclaim.  Plaintiff's position is contrary to the holding of the Supreme Court in *Sereboff v. Mid-*

*Atlantic Medical Services, Inc.*, 547 U.S. 356 (2006).

Extensive discussion of the *Sereboff* case is not necessary, as the case is both factually identical to the present case and legally dispositive of plaintiff's objection. In short, *Sereboff* was a civil action by an ERISA plan, brought pursuant to section 502(a)(3), to enforce a reimbursement provision that required a beneficiary who received benefits under the plan for injuries caused by a third party to reimburse the plan for those benefits from "all recoveries from a third party (whether by lawsuit, settlement, or otherwise)." 547 U.S. at 359. The Supreme Court granted *certiorari* to clarify the scope of remedial rights under section 502(a)(3). It observed that the plan's claim was essentially founded in contract, but that the relief it sought was equitable, in that the plan sought to impose an equitable lien on a specifically identifiable fund, rather than simply seeking to impose personal liability for a contractual obligation to pay money. 547 U.S. at 363.

The present case is even stronger than that presented in *Sereboff* for recognition of an equitable right to reimbursement. The reimbursement language found in the SPD explicitly imposes a trust in favor of the Plan on any settlement funds received from a third party. (SPD at 32). This is an "identifiable fund" subject to the imposition of an equitable trust. Once those funds are released from State Farm, they will be subject to a contractual trust under the SPD language, as well as an equitable lien under the authority of the *Sereboff* case.

In light of *Sereboff*, the court finds that the Plan's counterclaim properly arises under ERISA section 502(a)(3)(B)(ii) as seeking equitable relief to enforce the terms of the Plan.

**2.**

Plaintiff contends that the Plan has not established a factual basis for its reimbursement claim. Plaintiff points out that the SPD contains two separate reimbursement

provisions. The first, found at pages 31 through 33 of the SPD, applies if the insured had selected one of the PPO options. The second establishes rights of subrogation and recovery if the insured has elected the CDHP option. The Plan has asserted its right of reimbursement under the PPO reimbursement clause. Plaintiff asserts that there is no evidence to support this choice and that nothing in the record indicates that Brian Glover had elected the PPO option.

Plaintiff is mistaken. The Plan has submitted two sworn statements averring that Brian Glover had elected the PPO option. The first is the affidavit of Mabel Suzanne Fairley, an employee of the Plan Administrator. The second is a sworn interrogatory answer. When faced with this sworn evidence, the burden of proceeding shifted to plaintiff to produce some contrary evidence, sufficient to raise a triable issue of fact. *See Celotex Corp.*, 477 U.S. at 323. Rather than doing so, plaintiff merely argues that the Plan documents relevant to the Glover family do not clearly show that the family enrolled for the PPO option. This is argument, not fact. A mere argument that the opponent's unrebutted proofs may not be believed by the trier of fact is insufficient to escape a summary judgment. *See Fogerty v. MGM Group Holdings Corp., Inc.*, 379 F.3d 348, 353 (6th Cir. 2004). As a Plan participant, plaintiff is certainly in a position to know which coverage option he elected.[3] Because the type of coverage elected by Mr. Glover is certainly within his knowledge, only an affidavit or other admissible evidence would be sufficient to raise a triable issue of fact. As the party with the burden of proof, the Plan is obliged to show that no reasonable trier of fact could do other than to find in the plaintiff's favor on this issue. *See Arnett*, 281 F.3d at 561. In the present

_____

[3] The nature of the PPO option and that of the CDHP option are significantly different. The PPO option resembles traditional medical coverage, while the CDHP option is more complicated and demands more active involvement from the insured himself, requiring, among other things, creation of a health care reimbursement account. (*See* SPD, p. 87). It is unlikely that a participant would choose the CDHP option and be unaware of it.

case, the only proofs before the court with regard to coverage status show that the Glover family was covered by the PPO option. The Plan has met its high burden of proof on this issue at the summary judgment stage.

### 3.

The next issue involves the clarity of the SPD language creating a right of reimbursement. Plaintiff contends that the SPD language is ambiguous and does not clearly entitle the Plan to reimbursement in the circumstances of this case. General rules of contract interpretation guide the court in construing ERISA plans. Under these rules, the court is to interpret plan provisions according to their plain meaning. *See Williams v. Int'l Paper Co.*, 227 F.3d 706, 711 (6th Cir. 2000). The language of a benefit plan is ambiguous if it is subject to more than one reasonable interpretation. *See Wulf v. Quantum Chem. Corp.*, 26 F.3d 1368, 1376 (6th Cir. 1994).

Review of the Plan language discloses no ambiguity. The Plan creates both the right to subrogation and the right to reimbursement. (SPD, p. 31). The right to reimbursement, however, is the concept applicable to the present case. The Plan provides that if a third party causes a sickness or injury for which the participant receives a settlement, judgment, or other recovery, the participant "must use those proceeds to fully return to the Plan 100% of any benefits you received for that Sickness or Injury." (*Id.*). Included among the Plan definition of "third parties" is any person "alleged to have caused you to suffer a Sickness, Injury, or damages, or who is legally responsible for the Sickness, Injury, or damages." (*Id.*). This Plan language does not admit of more than one reasonable interpretation and so is not ambiguous.

Closely related is the "make whole" doctrine of the Sixth Circuit. This doctrine applies in situations, such as the present one, in which enforcement of a reimbursement clause would result in the participant's receipt of less than a full recovery for his or her injuries. That doctrine applies in the present case, as plaintiff would be required to reimburse the Plan out of a settlement compensating Morgan only for her non-economic injuries. Therefore, enforcement of the reimbursement clause would result in plaintiff's loss of any compensation for Morgan's non-economic damages. The Sixth Circuit adopted the "make whole" rule in *Copeland Oaks v. Haupt*, 209 F.3d 811, 813 (6th Cir. 2000), a subrogation case. The court followed the common-law rule adopted by other circuits "that an insurer cannot enforce its subrogation rights unless and until the insured has been made whole by any recovery. . . ." *Id.* at 814. The "make whole" rule is merely a default rule of construction. An ERISA plan can avoid the application of the "make whole rule" by including language conclusively disavowing the rule's application to the plan. Specifically, the Sixth Circuit requires that the plan be "clear in establishing both a priority to the funds recovered and a right to any full or partial recovery." *Id.* at 813. The Sixth Circuit later applied the "make whole rule" to reimbursement clauses as well as subrogation clauses. *Hiney Printing Co. v. Brantner*, 243 F.3d 956, 959-60 (6th Cir. 2001). Consequently, to avoid operation of the "make whole rule" in this case, the defendant Plan has the burden of demonstrating language conclusively disavowing the default rule, clearly establishing both a priority to the funds recovered and a right to any full or partial recovery.

The SPD in the present case is sufficient to avoid the default rule under the foregoing Sixth Circuit authority. The SPD provides that the Plan "has a first priority right to receive payment on any claim against a third party, before you receive payment from that third party." (SPD, p. 32).

-14-

It further states that the Plan's reimbursement rights "apply to full and partial settlements, judgments, or other recoveries paid or payable to you or your representative, no matter how those proceeds are captioned or characterized." (*Id.*). Relevant to the present case, the SPD states that payments include "economic, non-economic, and punitive damages." (*Id.*) And, to remove all doubt, the SPD provides that the Plan may enforce its reimbursement rights "regardless of whether you have been 'made whole' (fully compensated for your injuries and damages)." (*Id.*). It is difficult to imagine language that might more clearly disavow the make whole rule or establish in the clearest possible terms both a priority to the funds recovered and a right to any full or partial recovery. Consequently, the make whole rule, which is merely a default rule of construction, does not bar the Plan from seeking reimbursement for medical expenses out of Morgan's recovery for non-economic loss.

Plaintiff and Midwest raise a related argument under Michigan law. They assert that the reimbursement clause requiring a participant to reimburse a plan for medical expenses out of the participant's tort recovery for non-economic loss "indirectly violates Michigan public policy" in favor of fully compensating injured victims. *See Steinmann v. Dillon*, 670 N.W.2d 249, 253 n.6 (Mich. Ct. App. 2003). This public policy argument is said to arise from the provisions of the No-Fault Act, MICH. COMP. LAWS § 500.3135, which prohibit recovery of medical expenses from third-party tortfeasors. Michigan law, however, does not govern the validity of self-funded ERISA plans. By reason of the broad preemption provision of section 514(a) of ERISA, self-funded pension plans operate free from state law. *See FMC Corp. v. Holliday*, 498 U.S. 52 (1990); 29 U.S.C. § 1144(a). *FMC Corp.*, like the present case, involved a plan's right of reimbursement for medical expenses out of a tort recovery. The plan participant cited a Pennsylvania statute that specifically prohibited subrogation or reimbursement from a claimant's tort recovery in favor of an insurer who paid

medical expenses. 498 U.S. at 55. The Court held that the state's statute was preempted in the case of self-funded plans, which are deemed not to be insurers by the terms of ERISA. *Id.* at 61. The same result must apply here.

In short, the reimbursement clause of the SPD unambiguously entitles the Plan to recover its medical payments on behalf of Morgan from the tort settlement offered by the at-fault party, and the make-whole doctrine does not bar this claim.

**4.**

Finally, plaintiff argues that the Plan acted as a volunteer in paying Morgan's medical expenses, because the no-fault carrier was clearly responsible as the primary insurer for coverage of these expenses. Plaintiff suggests, but does not demonstrate, that the coordination-of-benefits provisions of the no-fault policy and the SPD somehow make the no-fault carrier primarily responsible in the circumstances of this case. Plaintiff's argument is insubstantial.

The coordination-of-benefits issue is governed by well-established principles of law. The policy of no-fault insurance issued by defendant Nationwide contained a coordination-of-benefits clause, under which the insurance company's obligation to pay medical bills was secondary to the obligation of any applicable health benefits plan. (Policy, p. N2). Policies of no-fault insurance issued under Michigan law contain such a provision by reason of section 3109a of the No-Fault Act, which requires no-fault insurers to offer, at an appropriately reduced premium, deductibles and exclusions reasonably related to other health and accident coverage on the insured. MICH. COMP. LAWS § 500.3109a. As a result of this statutory requirement, the Michigan courts have developed a priority of coverage rule such that, if a policy of no-fault insurance contains a

coordination-of-benefits clause under section 3109a and an applicable health care policy also contains a coordination-of-benefits provision, the health insurer will be deemed primary. This has come to be known as the *Federal Kemper* rule after *Federal Kemper Insurance Co. v. Health Insurance Admin., Inc.*, 383 N.W.2d 590 (Mich. 1986) (overruled in part by *Auto Club Ins. Ass'n v. Frederick & Herrud, Inc.*, 505 N.W.2d 820 (Mich. 1993)). Thus, under Michigan law, in most situations involving coordinated health and no-fault coverages, the health coverage will be primary to the auto policy to the extent that services are covered under the health plan. *See Toussignant v. Allstate Ins. Co.*, 506 N.W.2d 844, 848 (Mich. 1993).

Because the CBI Holdings Plan at issue here is self-funded, however, it is not subject to the requirements of state law. *FMC Corp.*, 498 U.S. at 61. Principles of ERISA preemption therefore require that the Plan's coordination-of-benefits clause take precedence over a conflicting cause in the no-fault policy. *See Lincoln Mut. Cas. Co. v. Lectron Prods. Inc., Employee Health Benefit Plan*, 970 F.2d 206, 209-10 (6th Cir. 1992); *Auto Club Ins. Assoc. v. Health & Welfare Plans, Inc.*, 961 F.2d 588, 593 (6th Cir. 1992) ("Self-insured ERISA plans, including self-insured plans containing coordination-of-benefits clauses, are not reached by 500.3109a."). Therefore, when a no-fault insurance policy and a qualified ERISA plan contain conflicting coordination of benefit clauses, the terms of the ERISA plan, including its coordination of benefit clause, must be given full effect. *American Med. Sec., Inc. v. Auto Club Ins. Ass'n of Mich.*, 238 F.3d 743, 754 (6th Cir. 2001) (citing *Auto Owners Ins. Co. v. Thornapple Valley*, 31 F.3d 371, 374 (6th Cir. 1994)).

The fact that ERISA preempts section 500.3109a, however, does not necessarily mean that an ERISA plan will prevail in a priority dispute. *See Citizens Ins. Co. of Am. v. Mid-Michigan Health ConnectCare Network Plan*, 449 F.3d 688, 696 (6th Cir. 2006). It is only when the no-fault

policy and the qualified ERISA plan contain conflicting coordination-of-benefit clauses that the terms of the ERISA plan must prevail. *Id.* In instances where the ERISA plan does not expressly disavow coverage for payment of medical benefits otherwise covered under a no-fault policy, the coordination-of-benefit clauses of each plan are given their full effect, and the ERISA plan is not automatically deemed secondary. *Id.*; *see Great-West Life & Ann. Ins. Co. v. Allstate Ins. Co.*, 202 F.3d 897, 900 (6th Cir. 2000). In the present case, the Plan does not expressly disavow coverage, and the coordination-of-benefits clauses between the Plan and the no-fault policy do not conflict in any way. As noted in the Findings of Fact, the coordination-of-benefit provisions of the Plan (found at pp. 27-30 of the SPD) do not state or imply that the Plan's coverage will be secondary to no-fault coverage. Consequently, at least at the time the CBI Plan acted, the Plan was clearly primary, and the Plan acted properly in paying Morgan's medical bills, to the extent that services were covered by the Plan.[4]

In summary, the court finds that the defendant Plan is entitled to judgment on its counterclaim seeking to recover under the reimbursement clause found at pages 31 through 33 of the SPD. The SPD language is clear and unambiguous, imposing a right of first priority in favor of the Plan from any recovery, whether complete or partial, received by the plan participant from a third party. Plaintiff's proposed receipt of $50,000 from the insurer of Virginia Hines to compensate for Morgan's non-economic injuries falls squarely within the reimbursement clause of the SPD, and neither plaintiff nor Midwest has raised a triable issue of fact or a dispositive issue of law in

---

[4] In essence, plaintiff is arguing that the Plan should have acted irresponsibly by denying coverage. This would have placed plaintiff in the nightmare situation of having a critically injured child in the hospital who is covered by two insurers, each of which is refusing to pay. Plaintiff should be thankful that the Plan did not take the irresponsible course that plaintiff now argues for.

opposition to the motion for summary judgment. The Plan will be granted a summary judgment imposing an equitable lien on any tort proceeds received by plaintiff to the extent of payments by the Plan for Morgan's treatment, now totaling $59,818.94.

### B. Plaintiff's Claim Against Nationwide

Plaintiff's complaint seeks a declaration that, to the extent that plaintiff is responsible for reimbursing the Plan for Morgan's medical expenses, Nationwide is primarily liable for those expenses under the PIP coverage of its no-fault policy. (Compl., ¶ 36). Nationwide disputes this claim, relying on the coordination of benefits language in its policy, which states that Nationwide's payment of medical benefits "shall be reduced by any amount paid or payable under any valid and collectible . . . medical, surgical or hospital direct pay or reimbursement health care plan." (Policy p. N4). The question for this court is whether plaintiff's reimbursement of medical expenses to the Plan renders this policy language inapplicable to the present case, because no medical benefits have been permanently "paid" by the health care plan. Nationwide concedes that plaintiff's claim against it falls within this court's supplemental jurisdiction, as codified by 28 U.S.C. § 1367(a). For the reasons set forth below, the court finds that plaintiff is entitled to summary judgment on his claim against Nationwide.[5]

---

[5] The complaint names as defendants both Nationwide Mutual Fire Insurance Company and Nationwide Mutual Insurance Company. The policy of no-fault insurance now before the court was issued by Nationwide Mutual Fire Insurance Company. (Policy, docket # 28, at ¶ 3). Plaintiff has not presented the court with any basis for concluding that Nationwide Mutual Insurance Company might be liable on the no-fault claim. Judgment will therefore be entered only against Nationwide Mutual Fire Insurance Company.

**1.**

Analysis of this state-law issue begins with the decision of the Michigan Supreme Court in *Sibley v. Detroit Automobile Inter-Insurance Exchange (DAIIE)*, 427 N.W.2d 528 (Mich. 1988). The issue in *Sibley* was whether an injured party who received medical benefits under the Federal Employees Compensation Act (FECA) but was later required to refund those benefits could collect for his medical expenses under the PIP provisions of his no-fault auto policy. Plaintiff was injured in an automobile accident during the course of his employment with the United States Postal Service and was ultimately paid FECA benefits of $17,221.00, representing all of his medical expenses and some lost wages. Plaintiff also filed a claim under his no-fault insurance policy. The insurer, DAIIE, honored the claim, but deducted from the no-fault benefits otherwise payable all sums plaintiff had received from federal FECA program. Plaintiff then pursued a tort claim for non-economic damages, which he settled for $32,500.00. Thereafter, federal officials demanded reimbursement of benefits paid under FECA from the amount received by plaintiff from the tort claim settlement. Reimbursement was authorized by federal statute, 5 U.S.C. § 8132, which created a right of reimbursement in favor of the government from any money received by the injured party in satisfaction of tort liability.

The *Sibley* court determined that the issue was governed by section 3109(1) of the Michigan No-Fault Act, MICH. COMP. LAWS § 500.3109(1). That statute provides that benefits "provided or required to be provided under the laws of any state or the federal government shall be subtracted from the personal protection insurance benefits otherwise payable for the injury." Construing the language of section 3109(1), the state Supreme Court held as follows:

We are persuaded that when the automobile no-fault act speaks of benefits "provided," it means benefits permanently provided. To the extent that benefits paid are retrieved by the alternative source provider out of the worker's tort recovery, they at that point cease to be "benefits provided" within the meaning of § 3109(1) relieving the automobile no-fault insurer of liability to the extent of "benefits provided" by alternative sources pursuant to state or federal law.

427 N.W. at 531. In reaching this conclusion, the court was guided by the policy of the No-Fault

Act:

But to the extent that the reduction in the automobile insurer's responsibility is from a source that retrieves reimbursement from the injured person's tort recovery, the amount so retrieved should not be deemed "benefits provided" within the meaning of the automobile no-fault act relieving the primarily liable automobile insurer of its primary responsibility to pay full benefits without reduction by reason of any tort recovery. Were it to be otherwise, the worker's tort recovery, contrary to the spirit of the automobile no-fault act, would be used, in effect, to reimburse the alternative source (the federal government) for the other "benefits provided" that substituted for automobile no-fault benefits.

*Id.* at 530-31.

The *Sibley* decision is not directly dispositive of a claim against the no-fault carrier

in the present case, as the *Sibley* court was construing the words of section 3109(1) of the No-Fault

Act and not the language of a coordination-of-benefits clause in a no-fault policy. The state Court

of Appeals was required, however, to reach this issue in *Dunn v. Detroit Automobile Inter-Insurance*

*Exchange*, 657 N.W.2d 153 (Mich. Ct. App. 2002). In *Dunn*, $96,000.00 in medical benefits were

paid to the injured plaintiff by his employer's ERISA plan. At the time of the accident, plaintiff also

had a no-fault insurance policy which provided for coordinated benefits. The coordinated benefits

provision made the no-fault insurer responsible for medical benefits except to the extent that benefits

"are paid or payable under your primary protection." *Id.* at 154. Plaintiff initiated a tort suit for non-

economic damages resulting from the accident, which ended in a settlement. The ERISA plan

exercised its right of reimbursement and Judge Robert Holmes Bell of this court held that the plan was entitled to recover from the proceeds of the tort settlement. *See Rockwell Int'l Corp. Employee Health Plan v. DAIIE*, case no. 1:99-cv-104, 1999 U.S. Dist. LEXIS 20284 (W.D. Mich. Dec. 23, 1999). Plaintiff brought suit in the state circuit court against the no-fault carrier. A panel of the state Court of Appeals, by two-to-one decision, determined that *Sibley* was not controlling and that the no-fault insurer was not required to reimburse plaintiff for the amount he repaid to the ERISA plan. 657 N.W.2d at 161.

*Dunn*, however, was not the last word on the issue. In 2006, the Sixth Circuit Court of Appeals decided a case that is factually and legally indistinguishable from the present controversy. In *Shields v. Government Employees Hospital Ass'n (GEHA)*, 450 F.3d 643 (6th Cir. 2006), plaintiff's minor was injured in a serious automobile accident. The minor's extensive hospital and medical bills, exceeding $160,000.00, were initially paid by GEHA, her mother's employer-provided health care plan. Thereafter, plaintiff recovered damages for non-economic loss in a tort action. GEHA claimed reimbursement from plaintiff pursuant to reimbursement provisions of the health plan. Plaintiff then sought to have defendant State Farm, her no-fault insurer, reimburse her for the cost of the medical expense that GEHA was now requiring her to pay. State Farm refused the claim, relying on its coordination-of-benefits provision, which stated that benefits "will be reduced by any amount paid or payable to you or any relative under . . . medical or surgical reimbursement plan." 450 F.3d at 645. Plaintiff filed a declaratory judgment action in this court against both GEHA and State Farm. Judge Miles found that GEHA's initial payments were not "amounts paid" within the meaning of State Farm's policy, because plaintiff was required to reimburse GEHA. Judge Miles

relied on the Michigan Supreme Court decision in *Sibley* to reach this result. State Farm appealed, citing the Michigan Court of Appeals decision in *Dunn v. DAIIE*. 450 F.3d at 646.

On appeal, the Sixth Circuit found *Sibley* to be dispositive of the issue and rejected *Dunn* as "not good law," because it was in conflict with *Sibley*. 450 F.3d at 646. The court recognized that *Sibley* involved interpretation of the words "benefits provided" in Mich. Comp. Laws § 3109(1) while the case before it required construction of language in a coordination-of-benefits provision of a no-fault policy, as did *Dunn*. The court did not find this distinction to be dispositive:

> Although *Dunn* interprets an insurance policy, and *Sibley* interprets a statute inapplicable to this action, *Dunn* nonetheless conflicts with *Sibley*. First, MCL § 3109 and MCL § 3109a, mandating coordinated benefits plans, were enacted for identical purposes. Both seek to eradicate duplicative insurance coverage -- one by allowing subtraction of benefits provided pursuant to law, and the other by mandating policies that provide coverage only from damages not covered by other policies. Additionally, the language of MCL § 3109 and the coordinated benefits policy in *Dunn* -- and in this case -- are similar. MCL § 3109 refers to benefits "provided" or "required to be provided" and the coordinated benefits plans refer to benefits "paid" or "payable." *Dunn*, 657 N.W.2d at 154. Thus, in determining whether a benefit was provided under MCL § 3109 or paid under a coordinated benefits plan, this Court should assume that the Supreme Court of Michigan would take a consistent approach.

450 F.3d at 649 (citations omitted). The court further found that the *Dunn* decision essentially allowed a no-fault insurer to receive reimbursement from tort damages, in contravention of the clearly stated policy of Michigan law, as enunciated in *Sibley*. 450 F.3d at 650.

The Sixth Circuit in *Shields* observed that in all cases such as this, the relevant inquiry is whether the health benefit was "paid." 450 F.3d at 650. The court noted that under *Sibley*, health benefits are not paid to a beneficiary if the beneficiary subsequently must reimburse the health carrier. *Id.*

*Shields* is authoritative and is binding on this court.[6]  The facts of *Shields* are indistinguishable from the facts of the present case, and the terms of the coordination-of-benefits clauses in each no-fault policy are virtually identical.  Both coordination-of-benefits clauses allow the no-fault insurer to reduce its obligation by any amount "paid or payable" by a health care plan. *Shields* authoritatively holds that amounts temporarily paid by the health care plan but reimbursed to the plan by the insured are not "paid," thus rendering the no-fault carrier liable to the extent of the reimbursement.

## 2.

Except for criticizing the *Shields* decision, defendant Nationwide has advanced no basis for denial of plaintiff's motion for summary judgment on the issue of Nationwide's responsibility to cover medical and related expenses under the PIP provisions of its no-fault policy, to the extent that plaintiff is required to reimburse those expenses to the Plan.  Instead, Nationwide seeks to avoid adjudication of the issue in this court, asking either that the court decline to exercise supplemental jurisdiction over plaintiff's claim against Nationwide or that the issue be certified to the Michigan Supreme Court for an authoritative decision.  For the reasons set forth below, the court declines each suggestion.

---

[6] The court is aware that the *Shields* decision was overruled in part by *Adkins v. Wolever*, 554 F.3d 650 (6th Cir. 2009).  *Shields* and other Sixth Circuit decisions had "adopted the *Welsh [v. United States*, 844 F.2d 1239 (6th Cir. 1988)] panel's assertion that state law applies to spoliation sanctions without discussion."  *Adkins*, 544 F.3d at 652.  In *Adkins*, the Sixth Circuit joined every other federal court of appeals that had addressed the spoliation issue and held that "a federal court's inherent powers include broad discretion to craft proper sanctions for spoliated evidence." 554 F.3d at 651.  Spoliation of evidence is not at issue.  *Shields* remains binding Sixth Circuit precedent.

Nationwide is correct in stating that plaintiff's claim against it arises under this court's supplemental jurisdiction. 28 U.S.C. § 1367(a). It is important for present purposes to understand exactly how the court's supplemental jurisdiction comes into play with regard to the state-law claims against Nationwide. Plaintiff initiated this action under the Declaratory Judgment Act, 28 U.S.C. § 2201. To determine whether a declaratory judgment complaint raises a claim within the court's federal-question jurisdiction, the court must consider whether the facts alleged in the plaintiff's well-pleaded complaint show that the *defendant* could file a coercive action arising under federal law. *AmSouth Bank v. Dale*, 386 F.3d 763, 775 (6th Cir. 2004). In other words, it is the character of the threatened action, and not of the defense, that determines whether there is federal-question jurisdiction. *Public Serv. Comm'n v. Wycoff Co.*, 344 U.S. 237, 248 (1952). In the present case, the coercive action arising under federal law is the defendant Plan's equitable claim for reimbursement under section 502(a)(3) of ERISA. Rather than waiting for the Plan to institute a federal action for reimbursement, plaintiff initiated this declaratory judgment action, essentially requesting a declaration that the Plan has no enforceable right of reimbursement against plaintiff. The Plan's coercive action against plaintiff, which clearly "arises under" federal law, supplies the necessary federal-question jurisdiction. "Federal courts have regularly taken original jurisdiction over declaratory judgment suits in which, if the declaratory judgment defendant brought a coercive action to enforce its rights, that suit would necessarily present a federal question." *Franchise Tax Bd. of Calif. v. Construction Laborers Vacation Trust*, 463 U.S. 1, 19 (1983) (ERISA case).

Thus, in determining jurisdictional questions, the court must transpose the parties as they would appear in an imaginary coercive action. In the instant case, the coercive action would be *CBI Plan v. Brian Glover* for equitable reimbursement under section 502(a)(3) of the ERISA.

Glover's claim against Nationwide is then properly characterized as a secondary, contingent claim under the PIP provisions of Nationwide's no-fault policy, seeking to recover medical benefits under the policy if, but only if, the court grants the Plan's request for reimbursement. In a coercive action, this claim by Glover (who is the imaginary defendant) would be a third-party claim arising under Fed. R. Civ. P. 14(a)(1), as it is a claim that Nationwide is liable to Glover "for all or part of the claim" asserted by the Plan. FED. R. CIV. P. 14(a)(1). "A third-party claim may be asserted under Rule 14(a) only when the third party's liability is in some way dependent on the outcome of the main claim or when the third party is secondarily liable to defendant." 6 CHARLES ALAN WRIGHT, ARTHUR R. MILLER, & MARY KAY KANE, FEDERAL PRACTICE & PROCEDURE § 1446 at 355-56 (2d ed. 1990); *accord American Zurich Ins. Co. v. Cooper Tire & Rubber Co.*, 512 F.3d 800, 805 (6th Cir. 2008). This is precisely the situation posed by the present case. Nationwide's liability to Brian Glover is completely dependent on the outcome of the Plan's claim for reimbursement against Glover. A defendant's claim against an insurance company that is contingent upon the plaintiff's recovery of judgment against the defendant is universally deemed to be properly brought as a third-party claim under Rule 14(a). *See, e.g., WTC Captive Ins. Co., Inc. v. Liberty Mut. Fire Ins. Co.*, 537 F. Supp. 2d 619, 626 (S.D.N.Y. 2008); *Certain Interested Underwriters at Lloyd's v. Gulf Nat. Ins. Co.*, 898 F. Supp. 381 (N.D. Miss. 1995).

The purpose of Rule 14 "is to permit additional parties whose rights may be affected by the decision in the original action to be joined so as to expedite the final determination of the rights and liabilities of all the interested parties in one suit." *American Zurich Ins. Co.*, 512 F.3d at 805. This promotes judicial efficiency by permitting the adjudication of several claims in a single action, thus eliminating circuitous, duplicative actions. *Id.* Where the third-party complaint shares

a "common nucleus of operative fact" with the case already before the court, the third-party action does not require an independent jurisdictional basis. Traditionally, such third-party claims were deemed to be within the court's "ancillary jurisdiction." 6 WRIGHT, MILLER & KANE, § 1444 at 321. Under traditional terminology, pendent jurisdiction allowed a *plaintiff* to join state-law claims to a federal claim when all claims arose from a common nucleus of operative fact. *See United Mine Workers of Am. v. Gibbs*, 383 U.S. 715 (1966); *see also Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 348-49 (1988). The doctrine of ancillary jurisdiction worked in favor of *defendants*, empowering defendants to assert claims against a third-party defendant without regard to whether there is an independent basis of jurisdiction, so long as the court has jurisdiction of the main claim between the original parties. *See King Fisher Marine Serv., Inc. v. 21st Phoenix Corp.*, 893 F.2d 1155, 1161 (10th Cir. 1990). In 1990, Congress passed 28 U.S.C. § 1367, which codified these common-law concepts, bringing them all under the umbrella of "supplemental jurisdiction." It remains clear under the statute that "supplemental jurisdiction exists over a properly brought third-party complaint." *Grimes v. Mazda N. Am. Operations*, 355 F.3d 566, 572 (6th Cir. 2004).

At common law, the concepts of pendent and ancillary jurisdiction granted the federal district courts the power to adjudicate all claims, including state-law claims, that derived from a common nucleus of operative fact. *Carnegie-Mellon*, 484 U.S. at 349. The Supreme Court from the earliest days made it clear that these doctrines merely gave the district court discretion to hear state-law claims, but did not create any obligation to do so. *Carnegie-Mellon*, 484 U.S. at 349-50; *Gibbs*, 383 U.S. at 726. Hence, when the federal-law claims are dismissed at the early stages of a case and only state-law claims remain, the Court directed that the district courts should generally decline the exercise of jurisdiction by dismissing the remaining state claims without prejudice.

*Carnegie-Mellon*, 484 U.S. at 350. This concept of discretion was carried over into the statutory

scheme enacted by section 1367. The statute grants the district court discretion to decline to exercise

supplemental jurisdiction in a number of circumstances:

> (c)    The district courts may decline to exercise supplemental jurisdiction over a claim under subsection (1) if --
>
> > (1)    the claim raises a novel or complex issue of State law,
> > (2)    the claim substantially predominates over the claim or claims over which the district court has original jurisdiction,
> > (3)    the district court has dismissed all claims over which it has original jurisdiction, or
> > (4)    in exceptional circumstances, there are other compelling reasons for declining jurisdiction.

28 U.S.C. § 1367(c). Applying this statute, the federal courts continue to hold that when the district

court has dismissed all claims over which it has original, federal-question jurisdiction, then the state-

law claims should generally be dismissed without prejudice. *See Brooks v. Rothe*, 577 F.3d 701, 709

(6th Cir. 2009).

That concept, however, does not apply to the present case. This court has not

dismissed the ERISA claim, over which it has original jurisdiction. Rather, the court has adjudicated

the federal claim and has granted relief against Brian Glover in favor of the Plan. This is not a case,

therefore, where the court finds the federal claim meritless, leaving only state-law claims. Indeed,

the court has granted relief on the federal claim, and the defendant seeks adjudication of a state-law

claim that arises only because the court has found against him on the ERISA action. "Section

1367(c)(3) applies only if all of the underlying claims have been dismissed. If any claim invoking

an independent basis of subject-matter jurisdiction remains viable, or was tried, or if plaintiff

prevails on such a claim, § 1367(c)(3) will not apply." 13D CHARLES ALAN WRIGHT, ARTHUR R.

MILLER, EDWARD H. COOPER & RICHARD D. FREER, FEDERAL PRACTICE AND PROCEDURE § 3567.3 at 441 (3d ed. 2008).

Consequently, this court sees little reason to decline the exercise of its supplemental jurisdiction as requested by Nationwide. Section 1367(c)(3) does not apply, as the federal-question claim was not dismissed. The case does not raise a novel or complex issue of state law, but an issue that is governed by the authoritative holding of the Sixth Circuit in *Shields*. The remaining claim does not substantially predominate over the federal-question claim. This case only arises because of the Plan's right to reimbursement under ERISA, and the dependent state-law claim becomes relevant only as a consequence of the Plan's principal claim. It is necessary for the court to declare the rights of all parties in this situation and thereby avoid the expense to the parties of multiple lawsuits in the state and federal courts. In such circumstances, the state-law claim is merely one aspect of the entire "case or controversy" existing among all the parties and does not predominate.

The Supreme Court has directed the district courts to exercise supplemental jurisdiction in a manner that best serves the principles of economy, convenience, fairness, and comity that underlie the doctrine. *See City of Chicago v. Int'l College of Surgeons*, 522 U.S. 156, 172-73 (1997). These principles all weigh in favor of adjudicating all claims in this case in a single forum, as the claims are interdependent and interrelated. Splitting the case into two lawsuits in two courts would not serve economy, convenience or fairness. The rule's general purpose is to "adjudicate interrelated matters in one litigation, so as to obtain consistent and fair results for the parties and avoid duplication of efforts for the courts." *Certain Interested Underwriters*, 898 F. Supp. at 384. This purpose would be frustrated by dismissing the claims against Nationwide. The only apparent reason to decline the exercise of supplemental jurisdiction in this case would be to avoid the binding

effect of the *Shields* decision. Nationwide has not cited any case in which a district court has exercised its discretion under the supplemental jurisdiction doctrine merely to allow a party to avoid the effect of binding circuit court precedent.

The suggestion that the court certify a question to the Michigan Supreme Court under Mich. Ct. R. 7.305(B) requires little discussion. The state Supreme Court rarely accepts certified questions from the federal courts, and almost never accepts them from the district court. The last time the state Supreme Court accepted a certified question from a federal district court was 2001. *See In re Certified Question from U.S. District Ct., Eastern Dist. of Mich.*, 622 N.W.2d 518 (Mich. 2001). The state Supreme Court routinely declines to answer certified questions from the federal courts of appeals, including the Sixth Circuit, *see, e.g., In re Certified Question from U.S. Court of Appeals for the Sixth Circuit*, 696 N.W.2d 687 (Mich. 2005), and the Ninth Circuit, *see In re Certified Question from U.S. Court of Appeals for the Ninth Circuit*, 711 N.W.2d 752 (Mich. 2006). In connection with recent requests for certification, at least one justice has expressed doubt that the state Supreme Court has the constitutional authority to answer questions from the federal courts. *See In re Certified Question from U.S. Bankruptcy Court for the Eastern Dist. of Mich.*, 722 N.W.2d 423, 424 (Mich. 2006) (Weaver, J., concurring). By making these observations, this court does not mean to express any disrespect for the state Supreme Court or disapproval of its nearly universal denial of requests for certification. The Michigan Supreme Court, like all other courts of last resort, is deluged with requests for adjudication, and must exercise its limited resources as it sees fit. The point is that the likelihood of receiving an answer from the Michigan Supreme Court on the question presented in this case is virtually nil, and it makes no sense to put the parties to the expense and delay of proceedings before the state Supreme Court that are almost certainly destined to be futile.

Certification of an issue to a state supreme court is not obligatory, but instead lies within the federal court's discretion. *Lehman Brothers v. Schein*, 416 U.S. 386, 390-91 (1974). Certification is most appropriate if the state law question is new and unsettled. *Transamerica Ins. Co. v. Duro Bag Mfg.,*, 50 F.3d 370, 372 (1995) (citing *Lehman Brothers v. Schein*, 416 U.S. at 390-91). A federal district court should also take into account whether the Sixth Circuit has examined the issue or related principles and found them to be settled. *Id.* at 372. This court finds that plaintiff's contingent claim against Nationwide under the PIP coverage of Nationwide's no-fault policy is governed by the Sixth Circuit's authoritative decision in *Shields*, which is indistinguishable from the present case. Plaintiff is therefore entitled to a summary judgment. The court sees no reason to exercise its discretion to avoid this result by remitting the parties to further litigation in the state courts.

## Relief

The court will enter an interim order granting the Plan's motion for summary judgment against Brian Glover, denying Nationwide's motion for summary judgment against plaintiff, and granting Glover's motion for summary judgment against Nationwide Mutual Fire Insurance Company. The court's interim order will declare the Plan's right of reimbursement against any tort recovery or settlement received by plaintiff, to the extent of $59,818.94, or the amount received by plaintiff, the lesser. The court will also declare that Nationwide is responsible under the PIP provisions of its no-fault policy to cover any medical or related expenses of Morgan Glover arising from the November 22, 2007 accident, for which the Plan has been reimbursed.

This declaration, however, will not conclude the litigation. Plaintiff is entitled to decide whether or not to accept the settlement tendered by State Farm, with the knowledge that the settlement will be subject to an equitable lien. If plaintiff decides to accept the settlement, Nationwide is entitled to examine the invoices for the medical expenses that it is now being called upon to cover, to determine whether the expenses indeed fall within the terms of PIP coverage. Plaintiff will therefore be directed to file an election with the court, no later than November 12, 2009, disclosing whether he will accept the settlement from State Farm. If he elects to accept the settlement, it will be subject to the imposition of an equitable lien in favor of the Plan, and all settlement proceeds must be deposited in the registry of the court no later than thirty days after the filing of the election. Nationwide will be granted the same thirty-day period in which to file a detailed statement with the court identifying the medical expenses, if any, that it is declining to cover, and the reason for its decision. The court expects counsel to exchange information concerning such medical expenses without the need for formal discovery, and thus to provide Nationwide with the information necessary for it to evaluate plaintiff's claim for PIP benefits in the time allowed by this court. The court will then conduct such further proceedings as may be necessary to adjudicate any outstanding issue, after which final judgment will be entered.

Dated: October 28, 2009          /s/ Joseph G. Scoville
                                 United States Magistrate Judge